## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| SCOTT R. PAULSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV-04-JEO-2500-E |
| | ) | |
| BACKYARD WRESTLING, INC.; | ) | |
| EIDOS, INC.; MIDWAY STUDIOS-LOS | ) | |
| ANGELES INC.,[1] D/B/A PARADOX | ) | |
| DEVELOPMENT CORPORATION; | ) | |
| XTREME ENTERTAINMENT MEDIA | ) | |
| GROUP, INC., and RANDOM HOUSE, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

This case is before the undersigned magistrate judge upon the motion of defendant CWS Entertainment, Ltd., to dismiss this action as to it.  (Doc. 10).[2]  Upon consideration, the court finds that the motion is due to be granted.

## BACKGROUND

Defendants Backyard Wrestling, Inc. ("Backyard") and Xtreme Entertainment Media Group, Inc. ("Xtreme") developed a series of videotapes depicting individuals participating in wrestling matches.  (Complaint at ¶ 14).[3]  Defendants Backyard, Midway Studios of Los Angeles, formerly known as CWS Development, Ltd. ("CWS"), doing business as Paradox Development ("Paradox"), and Eidos, Inc. ("Eidos"), developed video games based on the

---

[1] Midway Studios of Los Angeles was formerly known as CWS Development, Ltd.  See Doc. 23 at ¶ 4.

[2] References herein to "Doc. ___" are to the document numbers assigned by the Clerk of this Court following the filing of the "Notice of Removal" in this action.

[3] The initial state court complaint is included as an attachment to document 1 in the record.

videotaped wrestling matches.  (*Id.* at ¶ 17, Amended Complaint at ¶ 16, First Amendment at ¶ 1).[4]  Defendant Random House published a book called *Prima's Official Strategy Guide* to be used in conjunction with the video game.  The videos, games, and book featured a character named "Karnage."  The book contained a biography of "Karnage" and included the statement that "all products and characters mentioned in this book are trademarks of their respective companies."  (Complaint at ¶ 21).

On July 6, 2004, plaintiff Scott R. Paulson ("Paulson" or "the plaintiff"), a resident of Alabama, filed his initial state court complaint against the defendants, alleging that he had participated in the wrestling matches depicted in the videotapes, games, and book.  Paulson also alleges that the defendants used his character, "Karnage," without his knowledge or consent.  He further alleges that the defendants' videotaping of the matches, and their subsequent development into video games and a book, violated his common law right of publicity and his right to privacy through commercial misappropriation.  (Counts One and Three).  He also asserts that the defendants violated the Lanham Trademark Act of 1946, as amended,[5] by expressly and impliedly making false designations and representations of origin concerning the misappropriation of "his stage name, image, likeness, and/or persona," particularly the use of his "Karnage" stage name in their videos, games, and book.  (Count Two).  He further asserts state law claims for negligence, unjust enrichment, civil conspiracy, and outrage.  (Counts Four, Five, Seven, and Eight).  Finally, he seeks an accounting of "the unlawful and unauthorized misappropriations."  (Count Six).

---

[4] The "Amended and Restated Complaint" is located at document 20 and the "First Amendment to Amended and Restated Complaint" is located at document 23.

[5] 15 U.S.C. § 1125(a).

On October 8, 2004, CWS filed its motion to dismiss.  CWS, a California corporation with its principal place of business in California,[6] claims that the plaintiff's complaint against it is due to be dismissed for lack of personal jurisdiction pursuant to Alabama's long-arm statute (ALA. R. CIV. P. 4.2(b)) and premised upon due process considerations.  (Doc. 10 at pp. 1-2).

The plaintiff filed a response to the defendant's motion, asserting that CWS is within the reach of Alabama's long-arm statute as interpreted by the Eleventh Circuit Court of Appeals.  (Doc. 16 at pp. 7).  The plaintiff further asserts that this court's exercise of personal jurisdiction over CWS would not offend federal due process standards as interpreted by the United States Supreme Court.  (Doc. 16 at pp. 7-10).

The plaintiff filed his amended complaint on November 29, 2004, noting that CWS was doing business as Paradox, and Mahr Productions was doing business as Extreme.  (Amended Complaint at ¶¶ 4 & 5).  It also added a claim for deceptive trade practices.  (Count Nine).  On December 17, 2004, the plaintiff's first amendment further articulated the relationship between Midway Studios, CWS, and Paradox.  (First Amendment at p. 1).

## DISCUSSION

### 1.  Standard of Review

When a non-resident defendant challenges personal jurisdiction and no evidentiary hearing is required, the plaintiff must establish a prima face case of jurisdiction.  *Consolidated Development Corp. v. Sherritt, Inc.,* 216 F.3d 1286, 1291 (11th Cir. 2000).  *See also Morris v. SSE, Inc.,* 843 F.2d 489, 492 (11th Cir. 1988).  This burden is satisfied if the plaintiff presents

---

[6] The first amendment to the amended and restated complaint alleges that defendant Midway Studios – Los Angeles Inc., ("Midway"), was formerly known as CWS Entertainment, Ltd. and did business as Paradox Development.  (Doc. 23 at p. 1).

3

sufficient evidence to withstand a directed verdict. *Consolidated*, 216 F.3d at 1291. In

evaluating the evidence, the court must construe the plaintiff's allegations as true as far as they

are consistent with the defendants' affidavits and depositions. *Id*. To the extent that the

plaintiff's allegations are contradicted by the defendants' affidavits and depositions, the court

will construe all reasonable inferences in favor of the non-movant plaintiff. *Id. See also Morris*,

843 F.2d at 492 ("Where the evidence presented by the parties' affidavits and deposition

testimony conflicts, the court must construe all reasonable inferences in favor of the non-movant

plaintiff.").

## 2. Personal Jurisdiction – Background

In *Huey v. American Truetzschler Corp.*, 47 F. Supp. 2d 1342, 1346 (M.D. Ala. 1999),

United States District Judge Myron H. Thompson stated as follows:

> When a defendant challenges personal jurisdiction, the plaintiff has the
> twin burdens of establishing that personal jurisdiction over the defendant
> comports with (1) the forum state's long-arm provision and (2) the requirements
> of the due-process clause of the fourteenth amendment to the United States
> Constitution. *See Olivier v. Merritt Dredging Co.*, 979 F.2d 827, 830 (11th Cir.
> 1992), *cert. denied*, 507 U.S. 983, 113 S. Ct. 1577, 123 L. Ed. 2d 145 (1993).
> Because Alabama's long-arm provision, Ala. R. Civ. P. 4.2(a), authorizes the
> assertion of personal jurisdiction to the limits of the United States Constitution, a
> plaintiff may carry both these burdens by demonstrating that personal jurisdiction
> over the defendant meets the requirements of federal due process. *Id*. Due
> process requires, first, that the defendant have "certain minimum contacts" with
> the forum state and, second, that the exercise of jurisdiction over the defendant
> does not offend "traditional notions of fair play and substantial justice." *Burnham
> v. Superior Court of California, County of Marin*, 495 U.S. 604, 618, 110 S. Ct.
> 2105, 2114-15, 109 L. Ed. 2d 631 (1990) (quoting *International Shoe Co. v. State
> of Washington, Office of Unemployment Compensation and Placement*, 326 U.S.
> 310, 316, 66 S. Ct. 154, 158, 90 L. Ed. 95 (1945)).[7]

---

[7] Alabama's long-arm statute, ALABAMA RULE OF CIVIL PROCEDURE 4.2(b), provides that a non-resident defendant is
within the jurisdiction of Alabama courts "when the person or entity has such contacts with this state that the prosecution of the
action against the person or entity in this state is not inconsistent with the constitution of this state or the Constitution of the
United States. . . ." ALA. R. CIV. P. 4.2(b). The Supreme Court of Alabama has interpreted the reach of Rule 4.2(b) (formerly

The Supreme Court has identified two types of personal jurisdiction: specific and general. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-15 nn.8 & 9, 104 S. Ct. 1868, 1872 nn.8 & 9, 80 L. Ed. 2d 404 (1984). General jurisdiction arises from a party's frequent contacts with the forum state unrelated to the litigation. *See id.* at 414 n.9, 104 S. Ct. at 1872 n.9. Specific jurisdiction derives from a party's contacts with the forum that are related to the cause of action. *Id.* at 414 n.8, 104 S. Ct. at 1872 n.8. . . .

*See also Robinson v. Giarmarco & Bill, P.C.*, 74 F.3d 253, 256 (11th Cir. 1996), citing *Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990).

The dispositive issues in the present case are whether the defendant has the requisite minimum contacts and whether this court's exercise of personal jurisdiction over CWS comports with the Due Process Clause of the Fourteenth Amendment of the Untied States Constitution. *Mutual Service Ins. Co. v. Frit Industries, Inc.,* 358 F.3d 1312, 1319 (11th Cir. 2002). Three decisions of the United States Supreme Court are instructive.

In the first decision, *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980), the issue was whether an Oklahoma court could exercise *in personam* jurisdiction over a nonresident automobile dealer and its wholesale distributor (World-Wide Volkswagen) when their only connection with Oklahoma was the fact that an automobile sold in New York to New York residents was involved in an accident in Oklahoma. *Id*., 444 U.S. at 287. Finding that the defendants' contact was insufficient, the Court reiterated the following guiding principles:

---

ALA. R. CIV. P. 4.2(a)(2)) as extending personal jurisdiction as far as federal due process will allow. *Sieber v. Campbell*, 810 So. 2d 641, 644 (Ala. 2001).

The considerations in this case are the same under the plaintiff's Lanham Act claim. *See PDK Labs Inc. v. Friedlander*, 103 F.3d 1105, 1107 (2d Cir. 1997) ("In a federal question case where a defendant resides outside the forum state, a federal court applies the forum state's personal jurisdiction rules 'if the federal statute does not specifically provide for national service of process.' *Mareno v. Rowe,* 910 F.2d 1043, 1046 (2d Cir. 1990) (citing *Omni Capital Int'l. v. Rudolf Wolff & Co.,* 484 U.S. 97, 104-05, 108 S. Ct. 404, 409-10, 98 L. Ed. 2d 415 (1987)).").

. . . . The concept of minimum contacts, in turn, can be seen to perform two related, but distinguishable, functions. It protects the defendant against the burdens of litigating in a distant or inconvenient forum. And it acts to ensure that the States through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system.

The protection against inconvenient litigation is typically described in terms of "reasonableness" or "fairness." We have said that the defendant's contacts with the forum State must be such that maintenance of the suit "does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington, supra*, at 316, 66 S. Ct., at 158, quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S. Ct. 339, 342, 85 L. Ed. 278 (1940). The relationship between the defendant and the forum must be such that it is "reasonable . . . to require the corporation to defend the particular suit which is brought there." 326 U.S., at 317, 66 S. Ct., at 158. Implicit in this emphasis on reasonableness is the understanding that the burden on the defendant, while always a primary concern, will in an appropriate case be considered in light of other relevant factors, including the forum State's interest in adjudicating the dispute, *see McGee v. International Life Ins. Co.*, 355 U.S. 220, 223, 78 S. Ct. 199, 201, 2 L. Ed. 2d 223 (1957); the plaintiff's interest in obtaining convenient and effective relief, *see Kulko v. California Superior Court, supra*, 436 U.S., at 92, 98 S. Ct., at 1697, at least when that interest is not adequately protected by the plaintiff's power to choose the forum, cf. *Shaffer v. Heitner*, 433 U.S. 186, 211, n.37, 97 S. Ct. 2569, 2583, n.37, 53 L. Ed. 2d 683 (1977); the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies, *see Kulko v. California Superior Court, supra*, 436 U.S., at 93, 98, 98 S. Ct., at 1697, 1700.

*World-Wide Volkswagen*, 444 U.S. at 292. The Supreme Court concluded that the facts and circumstances in that case were wholly insufficient to predicate exercise of state-court jurisdiction. It stated:

Applying these principles to the case at hand, [ ] we find in the record before us a total absence of those affiliating circumstances that are a necessary predicate to any exercise of state-court jurisdiction. Petitioners carry on no activity whatsoever in Oklahoma. They close no sales and perform no services there. They avail themselves of none of the privileges and benefits of Oklahoma law. They solicit no business there either through salespersons or through advertising reasonably calculated to reach the State. Nor does the record show that they regularly sell cars at wholesale or retail to Oklahoma customers or

residents or that they indirectly, through others, serve or seek to serve the Oklahoma market. In short, respondents seek to base jurisdiction on one, isolated occurrence and whatever inferences can be drawn therefrom: the fortuitous circumstance that a single Audi automobile, sold in New York to New York residents, happened to suffer an accident while passing through Oklahoma.

*Id*. at 295 (footnote omitted). To the extent the plaintiffs argued that jurisdiction was proper because it was "foreseeable" that the vehicle would cause injury in Oklahoma, the Court rejected that contention stating:

If foreseeability were the criterion, a local California tire retailer could be forced to defend in Pennsylvania when a blowout occurs there, *see Erlanger Mills, Inc. v. Cohoes Fibre Mills, Inc.*, 239 F.2d 502, 507 (CA4 1956); a Wisconsin seller of a defective automobile jack could be haled before a distant court for damage caused in New Jersey, *Reilly v. Phil Tolkan Pontiac, Inc.*, 372 F. Supp. 1205 (N.J. 1974); or a Florida soft-drink concessionaire could be summoned to Alaska to account for injuries happening there, *see Uppgren v. Executive Aviation Services, Inc.*, 304 F. Supp. 165, 170-171 (Minn. 1969). Every seller of chattels would in effect appoint the chattel his agent for service of process. His amenability to suit would travel with the chattel. We recently abandoned the outworn rule of *Harris v. Balk*, 198 U.S. 215, 25 S. Ct. 625, 49 L. Ed. 1023 (1905), that the interest of a creditor in a debt could be extinguished or otherwise affected by any State having transitory jurisdiction over the debtor. *Shaffer v. Heitner*, 433 U.S. 186, 97 S. Ct. 2569, 53 L. Ed. 2d 683 (1977). Having inferred the mechanical rule that a creditor's amenability to a *quasi in rem* action travels with his debtor, we are unwilling to endorse an analogous principle in the present case.

This is not to say, of course, that foreseeability is wholly irrelevant. But the foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State. Rather, it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there. *See Kulko v. California Superior Court, supra*, 436 U.S., at 97-98, 98 S. Ct., at 1699-1700; *Shaffer v. Heitner*, 433 U.S., at 216, 97 S. Ct., at 2586, and *see id.*, at 217-219, 97 S. Ct., at 2586-2587 (Stevens, J., concurring in judgment). The Due Process Clause, by ensuring the "orderly administration of the laws," *International Shoe Co. v. Washington*, 326 U.S., at 319, 66 S. Ct., at 159, gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.

When a corporation "purposefully avails itself of the privilege of conducting activities within the forum State," *Hanson v. Denckla*, 357 U.S., at 253, 78 S. Ct., at 1240, it has clear notice that it is subject to suit there, and can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the State.  Hence if the sale of a product of a manufacturer or distributor such as Audi or Volkswagen is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others.  The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State.  *Cf. Gray v. American Radiator & Standard Sanitary Corp.*, 22 Ill. 2d 432, 176 N.E. 2d 761 (1961).

*Id*., 444 U.S. at 296-97 (footnote omitted).

In the second case, *Burger King Corporation v. Rudzewicz*, 471 U.S. 462, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985), the issue was whether the United States District Court for the Southern District Court of Florida could exercise personal jurisdiction over a Michigan franchisee that allegedly breached a franchise agreement with Burger King, a Florida corporation with its principal office in Miami.  *Id*., 471 U.S. at 464.  Finding that the trial court could exercise jurisdiction over the franchisee, the Supreme Court stated that the non-consenting defendant must have "fair warning that a particular activity may subject [it] to the jurisdiction of a foreign sovereign."  *Id*., 471 U.S. at 472 (citing *Shaffer v. Heitner*, 433 U.S. 186, 218, 97 S. Ct. 2569, 2587, 53 L. Ed. 2d 683 (1977) (Stevens, J., concurring)).  The "'fair warning' requirement is satisfied if the defendant has 'purposefully directed' [its] activities at residents of the forum . . . , and the litigation results from alleged injuries that 'arise out of or relate to' those activities . . . ."  *Id*., 471 U.S. at 472 (citations omitted).  The Court also noted that the "'purposeful

8

availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a

result of 'random,' 'fortuitous,' or 'attenuated' contacts . . . or the 'unilateral activity of another

party or third person.'" *Id.*, 471 U.S. at 475.  By way of example, the Court further stated:

> Thus "[t]he forum State does not exceed its powers under the Due Process Clause
> if it asserts personal jurisdiction over a corporation that delivers its products into
> the stream of commerce with the expectation that they will be purchased by
> consumers in the forum State" and those products subsequently injure forum
> consumers.  *World-Wide Volkswagen Corp. v. Woodson, supra,* 444 U.S., at
> 297-298, 100 S. Ct., at 567-568.  Similarly, a publisher who distributes magazines
> in a distant State may fairly be held accountable in that forum for damages
> resulting there from an allegedly defamatory story.  *Keeton v. Hustler Magazine,
> Inc., supra; see also Calder v. Jones,* 465 U.S. 783, 104 S. Ct. 1482, 79 L. Ed. 2d
> 804 (1984) (suit against author and editor). . . .

*Id.*, 471 U.S. at 473.  Lastly, the Court stated:

> Once it has been decided that a defendant purposefully established
> minimum contacts within the forum State, these contacts may be considered in
> light of other factors to determine whether the assertion of personal jurisdiction
> would comport with "fair play and substantial justice."  *International Shoe Co. v.
> Washington,* 326 U.S., at 320, 66 S. Ct., at 160.  Thus courts in "appropriate
> case[s]" may evaluate "the burden on the defendant," "the forum State's interest
> in adjudicating the dispute," "the plaintiff's interest in obtaining convenient and
> effective relief," "the interstate judicial system's interest in obtaining the most
> efficient resolution of controversies," and the "shared interest of the several States
> in furthering fundamental substantive social policies."  *World-Wide Volkswagen
> Corp. v. Woodson, supra,* 444 U.S., at 292, 100 S. Ct., at 564.

*Id.*, 471 U.S. at 476-77.

The Supreme Court's most recent pronouncement in this area is *Asahi Metal Industries

Co. v. Superior Court of California, Solano County*, 480 U.S. 102, 107 S. Ct. 1026, 94 L. Ed. 2d

92 (1987).  In that case, the issue was whether a California court could exercise personal

jurisdiction over an indemnification claim against a Japanese manufacturer who had no contacts

with that State after the victim's suit against the Taiwanese motorcycle tire tube manufacturer

9

had been settled and dismissed, leaving only the indemnification claim between the two foreign

companies.  The Justices unanimously agreed that the state court's exercise of jurisdiction

"would offend traditional notions of fair play and substantial justice" under the circumstances.

*Id.*, 480 U.S. at 113.  However, the Justices did not agree on the appropriate standard for

reviewing such claims.

Justice O'Connor, with three other Justices concurring, articulated what has become

known as the "stream of commerce plus" test, which provides:

> . . . .  The "substantial connection" . . .  between the defendant and the
> forum State necessary for a finding of minimum contacts must come about by *an
> action of the defendant purposefully directed toward the forum State*. . . .  The
> placement of a product into the stream of commerce, without more, is not an act
> of the defendant purposefully directed toward the forum state.  Additional conduct
> of the defendant may indicate an intent or purpose to serve the market in the
> forum state, for example, designing the product for the market in the forum state,
> advertising in the forum state, establishing channels for providing regular advice
> to customers in the forum state, or marketing the product through a distributor
> who has agreed to serve as the sales agent in the forum state.

*Id.*, 480 U.S. at 112 (citations omitted and italics in original).  The Court further noted that even

assuming that the valve manufacturer was aware that some of the valves sold to the tube

manufacturer would be incorporated into tire tubes sold in California there still was no showing

that the defendant purposefully availed itself of the California market warranting a finding of

personal jurisdiction.[8]  In a concurring opinion Justice Brennan, who was joined in part by three

---

[8] The Court noted:

[The valve manufacturer] does not do business in California.  It has no office, agents, employees, or property in California.  It does not advertise or otherwise solicit business in California.  It did not create, control, or employ the distribution system that brought its valves to California.  *Cf. Hicks v. Kawasaki Heavy Industries*, 452 F. Supp. 130 (M.D. Pa. 1978).  There is no evidence that [the valve manufacturer] designed its product in anticipation of sales in California.  *Cf. Rockwell International Corp. v. Costruzioni Aeronautiche Giovanni Agusta,* 553 F. Supp. 328 (E.D. Pa. 1982).

*Asahi*, 480 U.S. at 112-13.

other Justices, stated that a defendant's awareness that the stream of commerce will carry its product into the relevant forum is sufficient for jurisdictional purposes. *Asahi*, 480 U.S. at 117. Specifically, he stated, "The stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale. As long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise." *Id.* Justice Stevens, who was joined in part by three other Justices, was critical of the plurality in that he did not perceive the relevant lines being readily discernible. He stated, "The plurality seems to assume that an unwavering line can be drawn between 'mere awareness' that a component will find its way into the forum State and 'purposeful availment' of the forum's market. . . ." *Id.* at 122 (citation omitted).

With these principals in mind, the court will examine the propriety of exercising personal jurisdiction in the present matter.

### 3. General Personal Jurisdiction

"General jurisdiction exists whenever the defendant's connection with the forum state is 'continuous and systematic' – there need be no nexus between the forum and the litigation." *Lasalle Bank N.A. v. Mobile Hotel Properties, LLC*, 274 F. Supp. 2d 1293, 1297 (S.D. Ala. 2003) (quoting *Helicopteros Nacionales de Colombia*, 466 U.S. at 416). *See also Consolidated*, 216 F.3d at 1292 (general jurisdiction arises from a defendant's contacts with the forum that are unrelated to the cause of action being litigated). "The 'nonresident corporation's contacts with the forum that are unrelated to the litigation must be substantial' to warrant the exercise of general jurisdiction." *The Nippon Credit Bank LTD. v. Matthews,* 291 F.3d 738, 747 (11th Cir.

2002) (quoting *Consolidated*, 216 F.3d at 1292).  "Thus, the due process requirements for general personal jurisdiction are more stringent than for specific personal jurisdiction." *Consolidated*, 216 F.3d at 1292.

The defendant argues that the exercise of general personal jurisdiction in this case would be inappropriate because its contacts with Alabama simply are insufficient under the circumstances.  In support of its argument, the defendant cites to *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437, 72 S. Ct. 413, 96 L. Ed. 485 (1952) and *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S.408, 414-15, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984).

In *Perkins*, the United States Supreme Court held that the exercise of general personal jurisdiction over a foreign corporation was reasonable and just because the company president, who also was the general manager and principal stockholder of the company, maintained an office in the situs of the lawsuit from which he conducted business on behalf of the company.[9]

---

[9] Finding that the exercise of personal jurisdiction would not offend due process, the Court stated that

> if the same corporation carries on, in that state, other continuous and systematic corporate activities as it did here--consisting of directors' meetings, business correspondence, banking, stock transfers, payment of salaries, purchasing of machinery, etc.--those activities are enough to make it fair and reasonable to subject that corporation to proceedings in personam in that state, at least insofar as the proceedings in personam seek to enforce causes of action relating to those very activities or to other activities of the corporation within the state.

*Perkins*, 442 U.S. at 445-46.  The Court also noted the following facts as being sufficient to support the exercise of general personal jurisdiction by the state court, if it elected to do so on remand:

> . . . . The company's mining properties were in the Philippine Islands.  Its operations there were completely halted during the occupation of the Islands by the Japanese.  During that interim the president, who was also the general manager and principal stockholder of the company, returned to his home in Clermont County, Ohio.  There he maintained an office in which he conducted his personal affairs and did many things on behalf of the company.  He kept there office files of the company.  He carried on there correspondence relating to the business of the company and to its employees.  He drew and distributed there salary checks on behalf of the company, both in his own favor as president and in favor of two company secretaries who worked there with him.  He used and maintained in Clermont County, Ohio, two active bank accounts carrying substantial balances of company funds.  A bank in Hamilton County, Ohio, acted as transfer agent for the stock of the company.  Several directors' meetings were held at his office or home in Clermont County.  From that office he supervised policies dealing with the rehabilitation of the corporation's

*Id.*, 342 U.S. at 447-48.  The Court so concluded even though the defendant's mining operations were located elsewhere and the cause of action did not arise in the state where the suit was commenced.  In *Helicopteros*, the plaintiffs initiated a wrongful death action in Texas state court after four individuals were killed in a helicopter accident in Peru involving a defendant that was engaged in the business of providing transportation for oil and construction companies in that country.  The Court held that the defendant's contacts with Texas were insufficient under the due process clause for the exercise of general personal jurisdiction.  The evidence before the Court showed that the defendant did

> not have a place of business in Texas and never has been licensed to do business in the State.  Basically, [it's] contacts with Texas consisted of sending its chief executive officer to Houston for a contract-negotiation session; accepting into its New York bank account checks drawn on a Houston bank; purchasing helicopters, equipment, and training services from Bell Helicopter for substantial sums;[10] and sending personnel to Bell's facilities in Fort Worth for training.

*Id.*, 466 U.S. at 416.

---

properties in the Philippines and he dispatched funds to cover purchases of machinery for such rehabilitation.  Thus, he carried on in Ohio a continuous and systematic supervision of the necessarily limited wartime activities of the company.  He there discharged his duties as president and general manager, both during the occupation of the company's properties by the Japanese and immediately thereafter.  While no mining properties in Ohio were owned or operated by the company, many of its wartime activities were directed from Ohio and were being given the personal attention of its president in that State at the time he was served with summons.

*Id.*, 342 U.S. at 447-48.

[10] This court notes that the financial contacts the defendant had with the state of Texas were significant:

During the years 1970-1977, it purchased helicopters (approximately 80% of its fleet), spare parts, and accessories for more than $4 million from Bell Helicopter Company in Fort Worth.  In that period, Helicol sent prospective pilots to Fort Worth for training and to ferry the aircraft to South America.  It also sent management and maintenance personnel to visit Bell Helicopter in Fort Worth during the same period in order to receive "plant familiarization" and for technical consultation.  Helicol received into its New York City and Panama City, Fla., bank accounts over $5 million in payments from Consorcio/WSH drawn upon First City National Bank of Houston.

*Id.*, 466 U.S. at 411.

The plaintiff herein counters that the defendant "made the choice to develop games for some of the largest game publishers in the U.S.  Thousands of these games have likely been sold and/or rented in Alabama, and many of these games bear advertising for Paradox."  (Doc. 16 at p. 19).  In support of the argument, the plaintiff cites to *Lagrone v. Norco Industries, Inc*., 839 So. 2d 620 (Ala. 2002).  The plaintiff in that case, Lagrone, was injured when a pneumatic jack he was using struck him in the head.  The jack was manufactured by Fisher Products, a small Georgia company.  After Fisher was sued in an amended complaint, it moved to dismiss the action for lack of personal jurisdiction.  The Alabama Supreme Court determined that the trial court could properly exercise general jurisdiction over Fisher because it had the requisite minimum contacts in Alabama.  Specifically, the court noted that Fisher made 17 shipments of its products, totaling $15,296.98, to Alabama customers in a three year period.  *Id*. at 627.  Fisher sold the products to a Georgia distributor and facilitated shipment to the Alabama addressees by coordinating with the common carrier so that the goods were shipped from Fisher's Georgia facility to the Alabama addressees.  *Id*.  The jack that caused the injury was shipped by Fisher to the distributor's warehouse in Atlanta prior to its sale to an Alabama company that sold it to the plaintiff.  *Id*. at 623.  Finding that Fisher's contacts were "sufficiently 'continuous and systematic," the Alabama Supreme Court stated:

> Fisher Products conceded that it knew that the products included in the 17 transactions were being shipped to customers in Alabama.  Fisher Products placed its products into the stream of commerce, with not only the "expectation," but with the actual knowledge that the products would be purchased by consumers in this State.  *See World-Wide Volkswagen*, 444 U.S. at 297-98, 100 S. Ct. 559. Thus, even assuming that Fisher Products was unaware that the other products it sold to Norco and shipped to Norco's warehouses were to be marketed by Norco in Alabama, Fisher Products knew that those 17 shipments were being sold to Alabama customers.  Thus, in light of those shipments, Fisher Products "'should

14

reasonably [have] anticipate[d] being haled into court [in Alabama]." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985), quoting *World-Wide Volkswagen Corp.*, 444 U.S. at 295, 100 S. Ct. 559.

*Lagrone*, 839 So. 2d at 627-28.[11]

The plaintiff, as noted above, argues that the defendant's situation in the present action is akin to Fisher in *Lagrone* in that it "contracted to develop games for companies that essentially guaranteed that the games would be distributed and available in almost every 'big box' retailer in Alabama. . . .   Paradox made the choice to develop games for some of the largest game publishers in the U.S.   Thousands of these games have likely been sold and/or rented in Alabama, and many of these games bear advertising for Paradox."  (Doc. 16 at p. 19).   In contravention of the plaintiff's argument, the defendant asserts that *Lagrone* is distinguishable because it (CWS) "has not sold any goods and services in the State of Alabama."  (Doc. 17 at p. 2).   The defendant goes on to note that the plaintiff has not submitted any evidence showing that it "*actually manufactured, advertised, distributed or sold* these video games *in Alabama*."  *Id*. at p. 3 (italics in original).

The defendant cites *Borg-Werner Acceptance Corp. v. Lovett & Tharpe, Inc*., 786 F.2d 1055 (11th Cir. 1986), in support of its argument.  In *Borg-Werner*, the Eleventh Circuit held that a Georgia corporation's contacts with Missouri were not so "'continuous and systematic' as to permit the exercise of general personal jurisdiction over them."  *Id*., 786 F.2d at 1057.  In so finding, the court stated that the defendant's contacts were insufficient because it was a Georgia corporation, all the officers are residents of Georgia, it never was licensed in Missouri, it did not

---

[11]   The court also noted that it was "inconsequential that the jack made the basis of this action was not included in the 17 shipments made by Fisher Products directly to Alabama over a period of three years" because general *in personam* jurisdiction existed.  *Id*. at 628.

have an office or employees in Missouri, it did not solicit business in Missouri, it did not

provide services or close sales in Missouri, and it did not sell products to Missouri purchasers.

*Id*.

The foregoing cases, while instructive, are not dispositive.  Each is factually

distinguishable.  However, applying the above legal principles to the present case, the court

concludes that the defendant's contacts in Alabama are insufficient to justify the exercise of

general personal jurisdiction in this case.  The defendant is a California corporation with its

principal place of business in that state, the work designing and developing the interactive

software for the video game was done in California, the work was transferred to Eidos in

California, the defendant has no ownership rights in the game, and the defendant did not market

or distribute the game in Alabama.  (See Hsu Aff. at ¶ 4).[12]  Additionally, the defendant "has

never designed software for any video game developer in Alabama;" it "does not have any

interest in and does not use, possess or own any real property" in Alabama; it does not have any

bank accounts in this State; it has never entered into any contract in Alabama; it has not sold any

goods or services here; it does not actively advertise or solicit business in any direct manner here;

it does not transact any business here; it does not have any authorized agents here to transact

business; and, all of its employees and agents are located in California.  (*Id*. at ¶ 12).  Simply

stated, the court finds that the defendant's situation does not satisfy the "continuous and

systemic" rule for general personal jurisdiction purposes.

Under the circumstances, the court is unwilling to accept and adopt the plaintiff's

argument that "Paradox has had continuous and systematic general business contacts with

---

[12] The affidavit of Christine Hsu is located at document 11, exhibit A.

Alabama, and Paradox had sufficient minimum contacts for purposes of general jurisdiction."
(*Id*. at pp. 19-20).  The evidence in this case concerning Eidos is that it and not Paradox
marketed the Backyard Wrestling videos.  Additionally, there is no evidence the defendant was
involved in the distribution of videos for the other video game publishers.  Still further, there is
no evidence that the defendant had any type of ownership rights or profit sharing arrangement
with the other distributors.  Under the present circumstances, the court does not find the
defendant's contacts with Alabama to be minimally sufficient for the exercise of general personal
jurisdiction.  The fact that the defendant knew or should have known that the video games would
be sold throughout the United States, including Alabama, is not sufficient for purposes of general
jurisdiction.

Because this court finds that the defendant's minimum contacts with this jurisdiction are
insufficient, it is not necessary to address the additional question of whether the exercise of
jurisdiction over the defendant would comport with "traditional notions of fair play and
substantial justice."  *See Lawson Cattle & Equipment, Inc. v. Pasture Renovators LLC*, 2005 WL
1189631 *3 (11th Cir. 2005).

### 4.  Specific Personal Jurisdiction

In contrast to general personal jurisdiction, as previously noted, "a court can assert
specific jurisdiction over a person with a more attenuated connection to the forum when there is a
sufficient nexus between the forum and the matter at issue."  *Lasalle Bank*, 274 F. Supp. 2d at
1297.

> . . . .  For specific jurisdiction to apply, "[t]he nonresident defendant's
> contacts with the forum must be such that he has 'fair warning' that a particular
> activity may subject him to the jurisdiction of a foreign sovereign.  A person has

fair warning if he 'purposefully directs' his activities at the forum, and claims of injury result from these activities'. *Ruiz de Molina v. Merritt & Furman Insurance Agency, Inc*., 207 F.3d 1351, 1355 (11th Cir. 2000) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)). To constitute minimum contacts for purposes of specific jurisdiction, a defendant's contacts with the applicable forum must satisfy three criteria: first, the contacts must be related to the plaintiff's cause of action or have given rise to it; second, the contacts must involve some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum, thus invoking the benefits and protections of its laws; and third, the contacts must be such that the defendant should reasonably anticipate being haled into court in the forum. *See Vermeulen v. Renault, U.S.A., Inc.,* 985 F.2d 1534, 1546 (11th Cir. 1993), *cert. denied,* 508 U.S. 907, 113 S. Ct. 2334, 124 L. Ed. 2d 246 (1993).

*Lasalle*, 274 F. Supp. 2d at 1297.

To satisfy due process considerations for purposes of specific personal jurisdiction, the defendant must have purposefully established sufficient minimum contacts in the state of Alabama that are related to the plaintiff's cause of action. *Morris*, 216 F.3d at 492; *International Shoe*, 326 U.S. at 316. The defendant must have performed "some act by which it purposefully avail[ed] itself of the privilege of conducting activities with [Alabama], thus invoking the benefits and protections of its laws." *Burger King Corp.*, 471 U.S. at 476 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S. Ct. 1228, 2 L. Ed. 2d 1283 (1958)). As the court in *Merchantile Capital, LP v. Federal Transtel, Inc.*, 193 F. Supp. 2d 1243 (N.D. Ala. 2002), noted:

> . . . . It is well established that the requisite minimum contacts will exist to support the exercise of specific jurisdiction "only where the defendant 'purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" . . . . quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S. Ct. 1228, 2 L. Ed. 2d 1283 (1958). "This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, *Keeton v. Hustler Magazine, Inc.,* 465 U.S. [770, 774, 104 S. Ct. 1473, 79 L. Ed. 2d 790 (1984)]; *World-Wide Volkswagen Corp. v. Woodson,* [444 U.S.

286, 299, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980)], or of the 'unilateral activity of another party or a third person,' *Helicopteros Nacionales de Colombia, S.A. v. Hall,* [466 U.S. 408, 417, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984)]." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985). Thus, "the defendant's [own] conduct and connection with the forum State [must be] such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen,* 444 U.S. at 297, 100 S. Ct. 559.

*Mercantile Capital*, 193 F. Supp. 2d at 1248.

To the extent that the plaintiff argues that the defendant has sufficient contacts because it has a contract with the distributor, Eidos, Inc., under which CWS designed and developed or helped to design and develop the "Backyard Wrestling" games and Eidos distributed them to retail stores, including in the State of Alabama, the court does not find this sufficient. (See Hsu Aff. at ¶ 4). It is undisputed that the defendant was the software developer and Eidos was and is the distributor. Eidos's efforts placed the "Backyard Wrestling" games on the national market. It is also reasonable to infer under the circumstances that, given the nationwide scope of distribution of the games designed by CWS and distributed by Eidos, "Backyard Wrestling" games would be distributed throughout the country, including in Alabama. (See Doc. 16, Ex. G). In fact, the evidence before the court demonstrates that "Backyard Wrestling: Don't Try This at Home" is available for sale, both online and in stores, including world-wide and national retailers such as Wal-Mart, Target, Circuit City, Toys R Us, and Gamestop. (*Id*. at Ex. A). Of these retailers, it is undisputed that both Toys R Us and Gamestop have at least one location open for customers in Alabama where the "Backyard Wrestling" games are sold, in addition to the games' availability through these retailers' online stores. (*Id*. at Ex. A & C). Additionally, the evidence demonstrates that Blockbuster Video has at least twenty (20) locations where the "Backyard Wrestling" games are available for rent in north-central Alabama alone. (*Id*. at Morris Aff. at ¶

3).

Contrary to the plaintiff's assertion that the making of the "Backyard Wrestling" games available for sale and rent in Alabama and the advertising on the DVD, the case, and on the website constitutes purposeful acts in Alabama warranting the exercise of jurisdiction, the court finds otherwise. The mere fact that the game at issue is designed by CWS and is available for sale in Alabama does not, by itself, sufficiently demonstrate that CWS acted to purposefully avail itself of the privilege of conducting business in Alabama to justify this court's exercise of personal jurisdiction over CWS. To the extent the plaintiff further argues that CWS has performed other acts, particularly advertising, which, in Justice O'Connor's analysis in *Asahi*, constitutes the "additional conduct[ ]" warranting the exercise of specific personal jurisdiction over the defendant, the court finds that under the present circumstances that is not enough. *Asahi*, 480 U.S. at 112. This is particularly true where the evidence demonstrates that the defendant does not have ownership rights with Eidos concerning the product. As noted previously, the evidence before the court indicates that Eidos owns all the rights to the work product and finished game. (Hsu Aff. at ¶ 4).

The plaintiff also points out that the defendant advertises in Alabama on the cover for the DVD and through images on the DVD. Specifically, the evidence shows that when the game is loaded in either an Xbox or Playstation 2 console, the CWS/Paradox logo appears on the screen for several seconds before the game can be played. Because the player cannot fast-forward through the logo's appearance, the player must wait for the logo to disappear before he or she can begin playing the game. The Paradox logo also appears on the box cover of the game, available for potential buyers to recognize the defendant's involvement in producing the game before the

game is even purchased.  Thus, merely sitting on the shelves in Alabama stores, consumers are

notified of CWS's participation in the design of the game.  (See Doc. 16 at Ex. F).  According to

the plaintiff, the placement of the Paradox logo on the game's cover and in the DVD itself

constitutes CWS's purposeful attempts to make its association with the "Backyard Wrestling"

games known by consumers anywhere the games are played or sold, including in Alabama.

(Doc. 16 at p. 16).  Further, the plaintiff argues that the defendant advertises to Alabama

residents through its website, px.com.  As soon as the page is loaded, an advertisement for

"Backyard Wrestling 2: There Goes the Neighborhood" is displayed at the center of the viewer's

computer screen.  The advertisement contains the statement, in capital, bold yellow letters, "ON

SHELVES NOW!!"  The advertisement also includes the link "Read More at IGN," encouraging

viewers, including those in Alabama, to seek more advertising material on the "Backyard

Wrestling" games.  The advertisement contains an option to download wallpaper from the game

onto the viewer's computer.  This wallpaper option allows CWS to advertise the game to anyone

who looks at the viewer's computer screen, even if he or she is not using the computer.  Finally,

the advertisement includes a link to additional advertisements for the game, so the viewer may

watch commercials for the game on his or her computer screen.[13]  Thus, the plaintiff asserts that

the defendant through its website has made substantial efforts to reach a nationwide audience

online, including viewers in Alabama.

     In this case, the sales, advertising and other marketing of the items are not specifically

directed to customers in Alabama so as to warrant a finding of the necessary minimum contacts

---

[13] The website also allows the viewers to discuss CWS's games.  Through this forum, viewers in Alabama may seek advice from other viewers about how to play the games, compare each other's experiences and/or opinions about the games, and even decide whether they would like to purchase a game if other viewers recommend it.

to permit the exercise specific personal jurisdiction as to CWS.  While the efforts of Eidos, Inc.,

to reach national and world-wide retailers is significant and does result in Alabama contacts, the

court finds that the defendant (CWS) has not purposefully availed itself of the privilege of

conducting business in Alabama such that it could reasonably anticipate being within the

jurisdiction of the state of Alabama.[14]  *See Hanson*, 357 U.S. at 253; *World-Wide Volkswagen*,

444 U.S. at 297; *Burger King Corp.*, 471 U.S. at 474.

To the extent that the placement of the Paradox symbol in the DVD imaging and on the

accompanying case constitutes advertising, the court does not find that significant enough for

jurisdictional purposes.  *See Lawson Cattle*, 2005 WL 1189631 *3 ("'merely advertising in

magazines of national circulation that are read in the forum state is not a significant contact for

jurisdictional purposes.' *Charia v. Cigarette Racing Team, Inc*., 583 F.2d 184, 187 (5th Cir.

1978) (quotation marks and citation omitted)).  Otherwise, a business that advertised in a

national magazine would be subject to jurisdiction in virtually every state.  While these contacts

count, they do not count for much."); *Consolidated*, 216 F.3d at 1292 ("Placing advertisements in

a newspaper is not a sufficient connection to the forum for in personam jurisdiction.  *Johnston v.*

---

[14] To the extent that the plaintiff relies on *CSX Transportation v. Preussage International Steel Corporation*, 201 F. Supp. 2d 1228 (M.D. Ala. 2002), the court finds it distinguishable.  In *CSX*, one of the main issues was whether the handling of cargo with the knowledge that it will find its way into Alabama constitutes purposeful availment of the forum so as to invoke Alabama law.  The court also noted that a "closely related" question was whether the defendant could have reasonably anticipated a lawsuit in Alabama on the basis of such contacts.  The court held that the defendant's motion to dismiss was due to be denied because its contact with Alabama were sufficient to support personal jurisdiction.  Those contacts included the fact that it purposefully loaded the product on to trains bound for Alabama, it carried insurance in Alabama, the defendant "acknowledged that it was 'fully aware that [its] actions or omissions would have a substantial effect in' Alabama," and "it has provided services to Alabama-bound trains before and intends to do so in the future."  *CSX*, 201 F. Supp. 2d at 1236.  No analogous facts are present in this case.  The plaintiff's attempt to analogize the defendant's participation in the development of a video game that would be sold throughout the United States is flawed for a number of reasons.  First, no evidence even suggests that CWS directed or influenced where or how the product was distributed.  Second, there is no evidence that CWS purchased any insurance to limit its liability in Alabama.  Third, there is no acknowledgment that it realized that its conduct would have a "substantial effect" in Alabama.  Fourth, its responsibility under the contract with Eidos was completed when it supplied the product in California.

*Frank E. Basil, Inc.*, 802 F.2d 418 (11th Cir. 1986).)."[15]

Similarly, the court finds that the defendant's maintenance of a website is insufficient to subject the defendant to suit in this court. The Seventh Circuit recently held that "a defendant's maintenance of a passive website does not support the exercise of personal jurisdiction over that defendant in a particular forum just because the website can be accessed there." *Jennings v. AC Hydraulic*, 383 F.3d 546 (7th Cir. 2004).[16] There is no evidence that the defendant's website in the present instance can be used to transact a sale or other business. Absent more than it before the court in this case, this is not enough to warrant the exercise of jurisdiction.

## CONCLUSION

Premised on the foregoing, the defendant's motion to dismiss (doc. 10) is due to be granted. An appropriate order will be entered contemporaneously herewith.

**DONE**, this the 24th day of June, 2005.

*John E. Ott*

**JOHN E. OTT**
United States Magistrate Judge

---

[15] The court finds the plaintiff's reliance on *Worthy v. Bartley*, 307 F. Supp. 2d 1244 (M.D. Ala. 2004), to be insufficient. In *Worthy*, the question was whether there was personal jurisdiction on Georgia defendants that were sued in Alabama. The court found that there was jurisdiction because they (the defendants) advertised in the Columbus, Georgia and Phenix City, Alabama yellow pages, they paid for advertising in Phenix City, Alabama newspapers when new physicians joined the office, and they accepted insurance payments from Blue Cross and Blue Shield of Alabama. Unlike the *Worthy* defendants, CWS is not proximally located to the situs of the lawsuit, its "advertising" in this case is very different, its advertising is not specifically done in or directed at Alabama residents, and it (CWS)  was not paid by an Alabama entity for services performed on Alabama residents.

[16] While declining to define whether a website is "passive" or "active," the court noted that it was "join[ing] the several circuits that have addressed [the issue of passive websites.]" *Jennings*, 383 F.3d at 550 (citing *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712-13 (4th Cir. 2002); *Soma Med. Int'l v. Standard Chartered Bank*, 196 F.3d 1292, 1297 (10th Cir. 1999); *Mink v. AAAA Dev. LLC*, 190 F.3d 333, 337 (5th Cir. 1999)).